USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 3/31/2018

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

WAYNE STEWART,

                    Plaintiff,

      v.

CITY OF NEW YORK, *et al.*,

                    Defendants.

15-CV-4335 (RA)

OPINION & ORDER

---

RONNIE ABRAMS, United States District Judge:

Plaintiff Wayne Stewart, a paraplegic pretrial detainee at Rikers Island Correctional Center, brings this action against the City of New York, various individuals (Tanisha Bowen, Raul Ramos, Elizabeth Parboo, Zachary Rosner, Nina Edwards, Zulfiquar Bhuiyan, and two "John Does," collectively, the "Individual Defendants"), and a private corporation (Corizon Health, Inc.). Individual Defendants and Corizon were responsible for providing medical care to or arranging medical accommodations for Rikers detainees during the relevant time period. Stewart claims that the City, Individual Defendants, and Corizon all violated his right to constitutionally adequate medical care under 42 U.S.C. § 1983, and that the City also refused to adequately accommodate his disability under Title II of the Americans with Disabilities Act and § 504 of the Rehabilitation Act of 1973. Plaintiff asserts various other state-law claims, including negligent hiring, training, and retention, conversion, negligent infliction of emotional distress, and general negligence. Defendants now move to dismiss the case under Fed. R. Civ. P. 12(b)(6). For the following reasons, that motion is granted with prejudice as to Plaintiff's § 1983 claims and without prejudice as to his ADA and Rehabilitation Act claims. The Court declines to exercise jurisdiction over Plaintiff's state-law claims and thus dismisses them without prejudice.

# BACKGROUND

The following facts are drawn from the Second Amended Complaint (the "Complaint")

and its accompanying exhibits. Compl. (Dkt. 73, 73-1, 73-2); Decl. (Dkt. 62). These facts are

assumed to be true for the purposes of resolving Defendants' motion to dismiss. *See Stadnick v.*

*Vivint Solar, Inc.*, 861 F.3d 31, 35 (2d Cir. 2017).

## I.    Factual Background

In 2001 and 2002, as a result of a series of gunshot wounds, Stewart injured his wrists and

became paraplegic. Compl. ¶¶ 14, 50. Over time, Plaintiff's immobility has caused him to suffer

from chronic decubitus ulcers, also known as pressure ulcers or bedsores, which are prone to

infection. At some point (and prior to his detention at Rikers), Stewart's right leg had to be

amputated "due to an infection in his ulcers that went to the bone." *Id.* ¶¶ 285, 389. In 2009, the

Mount Sinai Rehabilitation Center recommended that he begin using a motorized wheelchair due

to his "severe upper extremity pain [and] imbalance," with the goal of "encouraging wound healing

and good skin integrity." *Id.* ¶ 51. Stewart used the motorized wheelchair until 2014, when he

was arrested and the wheelchair was confiscated.

After his arrest, Stewart was admitted to Bellevue Hospital Center for treatment of (and

surgery on) his ulcers. *Id.* ¶ 246. The doctors at Bellevue gave Plaintiff a treatment plan for his

ulcers that "included the use of the motorized wheelchair; the need for a Hill-Rom rental Clinitron

Rite Hite Fluidized air bed with trapeze; and wound care dressing changes, which included

instructions for properly cleaning and dressing" the ulcers every three days. *Id.* ¶¶ 59–60.

According to Stewart, Defendants failed to comply with each one of those three requests as

described below.

2

First, when Plaintiff was discharged from Bellevue, he was deprived access to a motorized wheelchair. Instead, he was provided with a manual wheelchair that lacked a safety belt, had "unstable" arm rests, and had "unsteady" front wheels that "caught in the grooves on the floor." *Id.* ¶¶ 72, 125. After he complained about the wheelchair in 2015, he received a new manual wheelchair that was also purportedly "defective." *Id.* ¶¶ 234–36. "Stewart . . . use[d] his weak upper body and injured wrists to maneuver the wheelchair from one place to the next." *Id.* ¶ 73. Defendants refused to provide Stewart with a motorized wheelchair or an Inmate Mobility Assistant to assist him getting around, which has allegedly "subject[ed] Mr. Stewart to harm as he manually wheels himself from place to place." *Id.* ¶ 402.

Second, Stewart was not provided with the Clinitron bed or a trapeze to "assist [him] in sitting up in the bed and repositioning himself . . . to avoid additional pressure sores" when he returned to Rikers. *Id.* ¶¶ 167, 171. Instead, he was transferred "to a bed that had a mattress bigger than the bed frame, no trapeze, and no side rails to prevent him from falling out of the bed." *Id.* ¶ 171. According to Stewart, the absence of a Clinitron bed and trapeze "made it difficult for [him] to heal his ulcers," and additional bedsores formed. *Id.* ¶¶ 177–79. As a result, he was readmitted to Bellevue Hospital a few weeks after his initial discharge. Plaintiff alleges that he was "frequently admitted to Bellevue for follow-up care" for his ulcers, as well as for other issues such as urinary tract infections. *Id.* ¶¶ 182, 277, 280, 290.

Stewart further alleges that, as a consequence of the "defective" manual wheelchair and the non-Clinitron bed, he has "suffered multiple injuries from several falls from the wheelchair and the bed." *Id.* ¶ 211. For example, he alleges several instances where he fell from his bed or wheelchair, including one time where he fell "as [he] wheeled himself to the law library" and was

3

going down a ramp. *Id.* ¶ 231. Injuries from his various falls allegedly included "injuries to his back and left knee," *id.* ¶¶ 223, 227, to "the left side of his head and left foot," *id.* ¶ 232, and to his ankle, *id.* ¶ 237. In February or March 2015, after repeated complaints, Stewart finally received a bed with a trapeze. *Id.* ¶ 186. He also appears to have been provided with bed side rails at some point in 2015. *Id.* ¶ 242 ("Mr. Stewart remained in a bed without side rails from August 2014 thr[ough] early to mid-2015.").

Third, Plaintiff asserts that Defendants failed to comply with the Bellevue doctors' instructions regarding his wound care. Bellevue had specified a "meticulous wound care" plan for his chronic ulcers. *Id.* ¶ 250. According to Stewart, Defendants did not follow these instructions. "When Defendants John Doe #1 and John Doe #2 performed the dressing change on Mr. Stewart," it was generally a "basic" "wet-to-dry dressing instead of the three step process ordered by the Bellevue specialist." *Id.* ¶¶ 256, 344. Stewart purportedly submitted several grievances claiming that the John Does "either would not comply" with the Bellevue plan "or refused to change his dressings period." *Id.* ¶ 261. The John Does allegedly "disagreed on the care needed for Mr. Stewart." *Id.* ¶¶ 270–73. During one of Stewart's frequent stays at Bellevue, he asked the wound care specialist to show him how to change his own dressings because he was afraid of infection. He changed his own dressings from March 2015 to May 2016, and his ulcers improved as a result. *Id.* ¶¶ 286–88.

Plaintiff also identifies a few other ways in which Defendants purportedly failed to provide him adequate medical care. He alleges that his ulcers and frequent falls caused him "extreme chronic pain" in his lower back and extremities. *Id.* ¶ 289. He admits that he received Tylenol, and then Tylenol with Codeine, for his pain, but he alleges that these prescriptions were "not strong

4

enough." *Id.* ¶¶ 295–96. Plaintiff asked Defendant Ramos (a doctor who often treated Stewart at Rikers) for stronger medication, but his requests were denied. *Id.* ¶ 307. On November 24, 2014, a few months after his arrest, a different doctor prescribed him MS Contin which "consistently managed" his pain from that point on. *Id.* ¶ 310.

Stewart also alleges that, during medical treatment at Rikers, Ramos, Defendant Bowen (a nurse at Rikers), and others failed to keep his body steady and thus caused him to fall. During one of those incidents, he alleges that he broke his leg as a result of the fall. *Id.* ¶¶ 217–19. He further alleges that he was incorrectly prescribed diabetes medication which caused him to have an "adverse result" once, *id.* ¶ 318, and that when he had a fever one day in December 2014, prison medical staff failed to correctly diagnose that he had a urinary-tract infection for which he was later treated at Bellevue, *id.* ¶¶ 331–33. Stewart also alleges other delays in treatment and care, which he asserts caused him to develop additional bed sores. *Id.* ¶¶ 301–02. Throughout his detention at Rikers, Stewart has repeatedly complained (often to Individual Defendants) about his treatment and the lack of appropriate medical equipment. *See, e.g., id.* ¶¶ 93–94, 103, 118, 127, 187, 193, 203.

## II. Procedural History

Plaintiff, proceeding *pro se*, filed his original complaint on May 29, 2015, and an amended complaint on January 25, 2016. Stewart asked the Court to request *pro bono* counsel on his behalf, and that request was granted. Before *pro bono* counsel appeared, Defendants filed a motion to dismiss. *See* Dkt. 27. The Court thereafter granted Plaintiff, proceeding through his *pro bono* counsel, leave to amend his complaint again. The Second Amended Complaint, as filed, is over 75 pages long with more than 450 paragraphs asserting nine causes of action. Defendants now

move to dismiss that complaint. *See* Dkt. 77. Stewart responded in opposition through counsel, and Defendants replied. *See* Dkts. 87, 90.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556). Although the Court must accept as true all non-conclusory factual allegations and draw all reasonable inferences in Plaintiff's favor, *Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008), it need not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

## DISCUSSION

### I. Claims under the ADA and Rehabilitation Act

Stewart asserts his claims under Title II of the ADA and § 504 of the Rehabilitation Act against only the City. He argues that the "City discriminated against [him] on the basis of his disability by denying him reasonable accommodations for his disability" and "by supplying him with a defective replacement wheelchair and defective bed." Compl. ¶¶ 379–80. Specifically, Stewart asserts that the City should have responded to his numerous grievances about his manual wheelchair and requests for his motorized wheelchair by returning the motorized wheelchair to

6

him or, at the very least, by providing him with an "Inmate Mobility Assistant" to help him move around the facility. *See id.* ¶¶ 384–88, 402.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, § 504 of the Rehabilitation Act "prohibits programs and activities receiving federal financial assistance from excluding, denying benefits to, or discriminating against 'otherwise qualified' disabled individuals." *McElwee v. Cty. of Orange*, 700 F.3d 635, 640 (2d Cir. 2012) (quoting 29 U.S.C. § 794(a)). These standards are "generally the same," and any fine distinctions between them are not implicated in this case. *See Wright v. N.Y. State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016). Thus, this Court will "treat claims under the two statutes identically." *Id.* (citation omitted). To state a claim under either statute, Plaintiff must allege that "(1) he is a qualified individual with a disability; (2) the defendant is subject to one of the [statutes]; and (3) he was denied the opportunity to participate in or benefit from the defendant's services, programs, or activities, or was otherwise discriminated against by the defendant because of his disability." *Disabled in Action v. Bd. of Elections in N.Y.C.*, 752 F.3d 189, 196–97 (2d Cir. 2014) (citation and footnote omitted).

The City argues that Plaintiff has failed to plead the third of these requirements. Ds' Mem. at 11 (Dkt. 79). To survive the City's motion to dismiss on a "failure to make a reasonable accommodation" theory, as Plaintiff attempts to do here, Stewart must plausibly allege that the City has "as a practical matter" denied him "meaningful access" to services, programs, or activities

to which he is "legally entitled." *Wright*, 831 F.3d at 72. "The hallmark of a reasonable accommodation is effectiveness." *Id.* (citation omitted).

In the Complaint, Plaintiff admits that he was able to use the manual wheelchair to travel around the facility, albeit with some difficulty. Compl. ¶¶ 73, 402. And he does not allege a single activity, program, or opportunity that he could not attend or get to at Rikers because he did not have a motorized wheelchair or Inmate Mobility Assistant. Thus, even accepting Plaintiff's non-conclusory factual allegations as true and drawing reasonable inferences in his favor, he has not plausibly alleged that the accommodation that Rikers provided to him—*i.e.*, the manual wheelchair and its subsequent replacements—deprived him of meaningful, effective access to, or otherwise "excluded [him] from," any service, program, or activity at Rikers. *See Ramrattan v. Fischer*, No. 13-CV-6890 (KPF), 2015 WL 3604242, at *5 (S.D.N.Y. June 9, 2015); *see also Atkins v. Cty. of Orange*, 251 F. Supp. 2d 1225, 1232–33 (S.D.N.Y. 2003). Plaintiff has further failed to allege "any discriminatory animus, or that he was excluded from any public service because of ill will against his disability." *Ramrattan*, 2015 WL 3604242, at *5. Accordingly, his ADA and Rehabilitation Act claims must be dismissed. *See id.*

In Plaintiff's opposition papers, he argues for the first time that the City's accommodation of his disability is "so inadequate that it deters [him] from attempting to access" the services at Rikers. *See* P's Mem. Opp. at 5 (Dkt. 87) (quoting *Wright*, 831 F.3d at 73). Normally, difficulty or inconvenience is not "tantamount to stating a claim of exclusion or discrimination." *Burgess v. Goord*, No. 98-CV-2077 (SAS), 1999 WL 33458, at *7 (S.D.N.Y. Jan. 26, 1999); *see also Carrasquillo v. City of New York*, 324 F. Supp. 2d 428, 443 (S.D.N.Y. 2004). In certain circumstances, however, an accommodation that discourages a disabled detainee from attempting

8

to access services can amount to a deprivation of meaningful access to those services and, consequently, to a violation of the ADA or Rehabilitation Act. In *Wright v. New York State Department of Corrections*, for example, the Circuit held that the plaintiff—an inmate at a facility managed by the New York State Department of Corrections and Community Supervision ("DOCCS")—created a triable issue of fact as to whether he was deprived meaningful access to prison services for two reasons. 831 F.3d at 73. First, the Circuit noted evidence that the disabled plaintiff in that case had been unable to "move freely throughout the DOCCS facility," and, second, it held that this immobility "discourage[d] his participation in prison activities." *Id.* The Circuit came to these conclusions by considering the plaintiff's testimony that he had been "at times, unable to visit the law library" and had "missed multiple morning sick calls, doctor appointments, and meals." *Id.* The plaintiff also testified that a number of jobs that he hoped to perform were "unavailable to him," but that he would be able to do them if he were provided a motorized wheelchair. *Id.* at 70, 73. He further attested that he chose to "avoid[] recreational time in the prison yard" because he feared that his inability to maneuver on his own would mean that he could not escape if a fight broke out. *Id.*

Here, Stewart does not allege in his Complaint even a single instance where he was deterred from taking advantage of any prison activity due to being in the manual wheelchair. He alleges that using the wheelchair causes him "harm" in some unidentified way, but nonetheless admits that he is able to use it to wheel himself around the facility. *See* Compl. ¶ 402. Similarly, although Stewart does identify one instance where he fell on a ramp on his way to the law library, he does not allege that he was unable to reach to the library, or that the incident deterred him from attempting to go to the library at any later point. *Id.* ¶ 231. Unlike the plaintiff in *Wright*, Stewart

9

does not allege—in his Complaint at least—that operating the manual wheelchair is so painful or difficult that it has discouraged him from attending any prison activity or taking advantage of any other services or programs. *See* 831 F.3d at 73.

In Stewart's opposition papers, he articulates his deterrence theory in slightly more detail. *See* P's Mem. Opp. at 5, 6. But any facts alleged there may not be considered on a motion to dismiss. *See Ramrattan*, 2015 WL 3604242, at *3. Moreover, even Plaintiff's opposition papers fail to identify a particular activity or program at Rikers that Stewart was deterred from attending. Given Plaintiff's admitted ability "to maneuver the wheelchair from one place to the next," as well as his failure to allege any particular activity or service to which he was deprived meaningful access because of the City's failure to provide him with a motorized wheelchair (or Inmate Mobility Assistant), he has not stated a claim for discrimination under the ADA and Rehabilitation Act. Compl. ¶¶ 73, 402.

Stewart certainly would be more comfortable in a motorized wheelchair, and the manual wheelchairs provided to him were far from an ideal accommodation. The ADA and Rehabilitation Act, however, "do not require 'optimal' accommodations"—they require only reasonable ones that give plaintiffs like Stewart effective and meaningful access to programs and activities. *See Brooklyn Ctr. for Independence of Disabled v. Bloomberg*, 980 F. Supp. 2d 588, 641 (S.D.N.Y. 2013) (citation omitted). Plaintiff has failed to allege that the manual wheelchair deprived him of that access. His claims under the ADA and Rehabilitation Act thus must be dismissed. They are dismissed without prejudice, however, because Plaintiff's motion papers suggest that he may have grounds to assert that he was deterred from attending certain prison activities in violation of the statutes. Given this Court's mandate to "freely give leave" to amend "when justice so requires,"

10

Fed. R. Civ. P. 15(a)(2), the Court dismisses these claims without prejudice and grants Plaintiff leave to amend to remedy the defects identified in this section, to the extent he can make such amendments in good faith.

## II.     Deliberate-Indifference Claims

Plaintiff's remaining federal claims seek relief under 42 U.S.C. § 1983, alleging that Individual Defendants, Corizon, and the City have violated his constitutional rights. "The Eighth Amendment forbids deliberate indifference to serious medical needs of prisoners." *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). For pretrial detainees like Stewart, this right arises under "the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eight Amendment." *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017).[1]

### A.     Claims against Individual Defendants

According to Stewart, the Individual Defendants—which include nurses, medical staff, and accommodations organizers at or working with Rikers—violated his constitutional rights by failing to provide him with adequate medical care. "To state a claim for deliberate indifference to serious medical needs against an individual defendant under § 1983, a pretrial detainee must satisfy a two-pronged test: first, the alleged deprivation of adequate medical care must be sufficiently serious"; and "[s]econd, the defendant must act with a sufficiently culpable state of mind." *Sankara v. City*

---

[1] The primary difference between the analysis under the Eighth and Fourteenth Amendments, as explained by the Second Circuit in *Darnell*, is that the *mens rea* prong under the Fourteenth Amendment is "defined objectively" rather than subjectively. 849 F.3d at 35. Thus, a pretrial detainee can succeed on a deliberate-indifference claim if he proves "that the defendant-official . . . recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or *should have known*, that the condition posed an excessive risk to health or safety." *Id.* (emphasis added).

*of New York*, No. 15-CV-6928 (VSB), 2018 WL 1033236, at *4 (S.D.N.Y. Feb. 22, 2018) (internal

citations omitted); *see also Salahuddin v. Goord,* 467 F.3d 263, 279–80 (2d Cir. 2006). Under the

first prong, the deprivation of medical care is sufficiently serious if a medical condition is one "of

urgency . . . that may produce death, degeneration, or extreme pain[.]" *Lewis v. Cavanugh*, 685 F.

App'x 12, 13 (2d Cir. 2017) (summary order) (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553

(2d Cir. 1996)). Under the second prong in the Fourteenth-Amendment context, Plaintiff must

allege that each Individual Defendant "acted intentionally to impose the alleged condition, or

recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the

pretrial detainee even though the defendant-official knew, or should have known, that the condition

posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35.

The Individual Defendants' alleged failings fall roughly into two categories. The first

category of alleged violations involves Individual Defendants' allegedly negligent care while they

were providing medical treatment to Stewart. These purported violations include several instances

where Individual Defendants allegedly failed to stabilize Stewart's body during treatment and

caused him to fall and injure himself, as well as Stewart's claim that he was erroneously prescribed

diabetes medicine that caused him to have an adverse reaction.

Plaintiff cannot state a deliberate-indifference claim based on these allegations for several

reasons. As to the diabetes prescription, the Complaint fails to identify how any particular

Individual Defendant was involved at all, requiring dismissal of that claim. *See Colon v. Coughlin*,

58 F.3d 865, 873 (2d Cir. 1995) ("It is well settled in this Circuit that 'personal involvement of

defendants in alleged constitutional deprivations is a prerequisite to an award of damages under

§ 1983.'" (citation omitted)). Moreover, neither the diabetes prescription nor the Individual

Defendants' failure to stabilize Plaintiff's body during treatment constitute deprivations of care for objectively serious medical needs. Rather, they are claims for negligence that allegedly occurred during the course of Stewart's medical treatments at Rikers. Such allegations focus on the quality, rather than the deprivation, of medical care. *See Estelle*, 429 U.S. at 106–07; *Darnell*, 849 F.3d at 36. Deliberate-indifference claims are "not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, [and] not every lapse in prison medical care will rise to the level of a constitutional violation." *Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003). Thus, to the extent that Stewart's § 1983 claims are founded on Individual Defendants' allegedly negligent acts in the course of treating Stewart's other medical concerns, they must be dismissed.

The second category of alleged violations involve Stewart's allegations that Individual Defendants and/or other Rikers staff failed to provide him with a motorized wheelchair or Inmate Mobility Assistant; failed to give him a special "Clinitron" bed; did not regularly and properly redress his ulcers; did not promptly or sufficiently address his pain from his ulcers and other injuries; and failed to provide appropriate medical care to him when he was running a fever due to a urinary tract infection.

The Court need not decide whether Stewart's chronic ulcers, pain, and instability due to his paralysis amount to objectively serious medical conditions because, for the reasons explained below, the Complaint fails to allege that Individual Defendants "knew or should have known" that the care they provided for those conditions "posed an excessive risk" to Stewart's health or safety. *Darnell*, 849 F.3d at 35. Although some Individual Defendants certainly could have provided Plaintiff with better care and superior medical equipment, the care and equipment that Plaintiff did receive demonstrates that they were not deliberately indifferent to his medical needs.

13

Plaintiff's ulcers, for example, were monitored and treated by Individual Defendants. Stewart describes in his Complaint how Individual Defendants repeatedly provided him with medical evaluations and care, how the John Does and other unidentified nurses would change his dressings (even if they did so less frequently and less competently than they should have), and how Stewart was often sent to Bellevue for additional treatment. The Complaint at no point alleges that any Individual Defendant was aware or should have been aware that Stewart's ulcers were infected and failed to do anything about that infection. Indeed, it is not clear from the Complaint when (or the extent to which) Stewart's ulcers became infected during his time at Rikers, or how serious any such infection may have become before being treated. Paragraph 440 of the Complaint appears to be the only place where Stewart alleges that that the wound-care regime at Rikers caused "in some cases infection of the wounds," but in that same paragraph he admits that he was sent to Bellevue to receive treatment for his ulcers on such occasions. Although Plaintiff's ulcers likely did not heal as quickly as they would have under better conditions, the Complaint does not allege any reason that Individual Defendants should have known that such a delay in healing posed an excessive risk to Stewart's health.

As to Stewart's pain, he admits that, within a few months of arriving at Rikers, his doctors progressed from supplying him with Tylenol, to Tylenol with Codeine, to an MS Contin prescription that Stewart acknowledges manages his pain. That Ramos denied Plaintiff's earlier requests for stronger pain medication does not state a claim for deliberate indifference. *See Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011). "Issues of medical judgment cannot be the basis of a deliberate indifference claim where [additional] evidence of deliberate indifference is lacking." *Id.* The decision to "treat[] pain with over-the-counter, as opposed to prescription, medication is

14

a disagreement over treatment that [generally] does not rise to the level of deliberate indifference[.]" *Thomas v. Westchester County*, No. 12-CV-6718 (CS), 2013 WL 3357171, at *5 (S.D.N.Y. July 3, 2013) (gathering cases). Here, Stewart does not allege any facts suggesting that defendant Ramos's failure to prescribe the specific pain medication that Plaintiff requested was accompanied by a sufficiently culpable state of mind. Stewart's "fe[eling]" that Ramos denied him stronger medication because of the grievances that Stewart had filed against him, Compl. ¶ 307, does not plausibly allege that Ramos knew, or should have known, that his decision not to prescribe stronger medication would pose an excessive risk to Stewart's health or safety, "particularly in light of Plaintiff's receipt of non-prescription pain medication and ongoing medical attention." *Thomas*, 2013 WL 3357171, at *6.

Similarly, Plaintiff has not adequately alleged that Individual Defendants were deliberately indifferent to his need for additional safety devices on his wheelchair and bed. Although Individual Defendants may have known about some of Stewart's falls from his wheelchair and bed, Plaintiff has not alleged facts establishing that Individual Defendants should have been aware that their failure to provide him with additional safety features posed "a substantial risk of serious harm" to Stewart. *See Knight v. Mun. Corp.*, No. 14-CV-3783 (PAE) (JCF), 2016 WL 4030632, at *6 (S.D.N.Y. July 26, 2016). In other words, the Complaint does not allege any reason why any Individual Defendant should have known that the possibility that Stewart might fall posed an "*excessive* risk" to his health or safety. *See Darnell*, 849 F.3d at 32, 35 (emphasis added). The Complaint does not, for example, allege that Individual Defendants knew of, or should have known of, any serious injuries from the falls that Stewart had allegedly experienced from his bed and

15

wheelchair.[2] To the extent that Stewart alleges serious consequences from his falls, he alleges them only for his falls from an exam table during treatments in which some Individual Defendants failed to stabilize his body—and those claims fail for the reasons explained above. *See* Compl. ¶¶ 292–93. Moreover, Rikers appears to have remedied the safety concerns with Stewart's bed by mid-2015 by providing a trapeze and side rails. *See id.* ¶¶ 186, 242. Around that same time, Rikers also provided Stewart with a replacement manual wheelchair (albeit one that was still purportedly defective). *See id.* ¶¶ 234–36. Although these solutions were not as speedy or effective as they might have been, they further demonstrate that Individual Defendants—to the extent that they were involved in these decisions at all—were not deliberately indifferent to Stewart's serious medical needs.

Plaintiff further alleges that, when he was running a fever "one evening in December 2014"—apparently on December 16, 2014, according to Stewart's grievance about the incident, *see id.* ¶ 335 (incorporating Exhibit 78 (Dkt. 62-81)), although the timing is not completely clear— medical staff at Rikers took his temperature but failed to diagnose that he had an infection, merely providing him with "one Tylenol" in response to his complaints. *Id.* ¶¶ 331–32. By December 17, 2014, he was diagnosed with and treated for a urinary tract infection at Bellevue Hospital. *Id.*

---

[2] Even if Individual Defendants had known about all the injuries that Stewart alleges, those injuries would not have put Defendants on notice that future falls posed an excessive risk of harm to Stewart. It appears that his falls often did not injure him. *See, e.g.*, Compl. ¶¶ 3, 6, 114, 225, 233, 238, 240 (alleging falls or concerns about such falls without specifying any injuries). And he does not allege facts supporting an inference that Individual Defendants knew or should have known of any serious injuries (or a substantial risk for future serious injuries) resulting from his falls. *See, e.g.*, Compl. ¶¶ 211, 363, 382, 387 (vaguely alleging "multiple injuries" from falls); ¶¶ 223, 231–32 (alleging "injuries to his back and left knee" from one fall and injuries to "the left side of his head and left foot" from another, with no indication that such injuries were objectively serious); ¶ 291 (alleging that "frequent falls . . . exacerbated his pain problems," which were treated with Tylenol or other medication).

16

¶¶ 333, 335. Plaintiff fails to identify the involvement of any Individual Defendant in this event. *Colon*, 58 F.3d at 873. Thus, he has not alleged that any Individual Defendant was deliberately indifferent to his need for treatment for his fever or UTI, which apparently were promptly treated regardless.

To the extent Plaintiff argues that Individual Defendants unconstitutionally delayed his access to medical care or access to better medical equipment and safety features, he has also failed to state a claim. To survive a motion to dismiss on this theory, Stewart must still plausibly allege that Individual Defendants intentionally or recklessly delayed his access to care when they knew or should have known that the delay posed an excessive risk to his health or safety. *See Darnell*, 849 F.3d at 35; *see also Bell v. Jendell*, 980 F. Supp. 2d 555, 561–62 (S.D.N.Y. 2013) (gathering cases where courts dismissed plaintiffs' deliberate-indifference claims for failing to allege that a delay in care was either intentional or reckless under the *mens rea* prong). At no point in the Complaint here, however, does Stewart allege facts indicating that any Individual Defendant acted intentionally to delay the provision of medical treatment in a way that subjected Stewart to an excessive risk of harm, or that any Individual Defendant recklessly failed to act with reasonable care to mitigate any excessive risk posed by a subsequent delay in provision of medical treatment. Stewart received medical care at Rikers—and, on referrals from the Rikers medical staff, at Bellevue—on a regular basis. Although he allegedly did not have his dressings changed as often as prescribed, and although it apparently took the administrators months to respond to his complaints about his allegedly defective manual wheelchair and about the lack of safety features on his bed and chair, there is no indication in the Complaint that any Individual Defendant should have known that such delays posed an excessive risk to Stewart.

Plaintiff's arguments in opposition to Defendants' motion rely in large part on *Martinez v. Mancusi*, where the Circuit held that prison officials acted with "more than mere negligence or poor medical judgment" when they "deliberate[ly] disregard[ed]" other doctors' "explicit medical instructions," and that disregard "result[ed] in serious and obvious injuries." 443 F.2d 921, 924–25 (2d Cir. 1970). According to Stewart, this case stands for the proposition that a deliberate-indifference claim should survive a motion to dismiss so long as the plaintiff alleges that "medical staff members fail[ed] to follow the prescription of another physician." P's Mem. Opp. at 8. But the Circuit in *Martinez* did not create such a categorical rule. Instead, the court looked to the specific facts at hand and concluded that the allegations amounted to "gross misconduct" by the prison officials. *Martinez*, 443 F.2d at 924. In *Martinez*, the prisoner had just received surgery on his leg and was under strict orders not to stand or walk, because moving his leg could make the surgery unsuccessful. *Id.* at 923. Nonetheless, and without a formal discharge from the hospital, corrections officers handcuffed him and made him walk out of the hospital. *Id.* The patient was discharged from the prison hospital a day later and was sent back to his cell, where he had to stand for meals, move his leg, and lacked medication or accommodations of any sort. *Id.* His surgery "ultimately proved unsuccessful" as a result. *Id.* The blatant disregard of the surgeons' instructions in that case thus constituted a "reckless failure" by prison officials "to inform themselves of a prisoner's medical needs" with serious consequences. *See Startz v. Cullen*, 468 F.2d 560, 561–62 (2d Cir. 1972) (citing *Martinez*, 443 F.3d at 924).

For the reasons explained above, Individual Defendants' purported failure to follow the Bellevue prescriptions of a motorized wheelchair, a Clinitron bed, and meticulous wound-care procedures fall short of the kind of gross misconduct that amounted to deliberate indifference in

*Martinez*, and that conclusion holds even under the "objective" recklessness standard that applies under the Fourteenth Amendment. *See Darnell*, 849 F.3d at 35. By all accounts—including Plaintiff's own—Individual Defendants responded to Stewart's complaints at least in part, even if it took them some time to do so and their solutions were not always effective. They took various steps to alleviate his pain and discomfort, provided him with frequent medical evaluations and treatment, and regularly sent him to Bellevue for additional care. *See, e.g.,* Compl. ¶¶ 31, 47, 179, 212–15, 220, 256, 277, 331–34, 442. Although Individual Defendants did not always follow the Bellevue doctors' instructions, the Complaint does not allege facts establishing that they were deliberately indifferent to an excessive risk to Stewart. In short, their purported failings—while not to be condoned—do not amount to violations of Stewart's Due Process rights. Accordingly, Plaintiff's deliberate-indifference claims against the Individual Defendants are all dismissed.

### B. Deliberate-Indifference Claim against the City

Defendants further argue that the Complaint's § 1983 claims must be dismissed against the City. To hold a municipality liable under § 1983 for the unconstitutional acts of its employees, Plaintiff must plead and prove that the violations of his constitutional rights were caused by a policy or custom of the municipality. *See Monell v. Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658, 694 (1978); *Byrd v. City of New York*, No. 17-CV-2166 (AJP), 2018 WL 259316, at *6 (S.D.N.Y. Jan. 2, 2018). Such a claim, however, "cannot lie in the absence of an underlying constitutional violation." *Byrd*, 2018 WL 259316, at *13 (citation omitted); *see also Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006). Given this Court's conclusion that Plaintiff has failed to plead sufficient facts to allege an underlying violation of his constitutional rights under the Fourteenth Amendment, Plaintiff's § 1983 claim against the City must also be dismissed.

19

## C. Deliberate-Indifference Claim against Corizon

The Complaint also purports to assert a § 1983 claim against Corizon, which had contracted with the City to provide health services to inmates at Rikers at the time when the events underlying this case occurred. Neither Plaintiff nor Defendants address in their motion papers the theory under which Corizon could be held liable for deliberate indifference. In any event, given that Stewart has failed to state a claim against any Individual Defendant or the City for the reasons explained above, his claim against Corizon too must fail. *See generally Bess v. City of New York*, No. 11-CV-7604 (TPG), 2013 WL 1164919, at *2 (S.D.N.Y. Mar. 19, 2013); *Bektic-Marrero v. Goldberg*, 850 F. Supp. 2d 418, 432 (S.D.N.Y. 2012).

## D. Dismissal with Prejudice

Stewart has already been given an opportunity to amend his original complaint, Dkt. 6, as well as further opportunity to amend while represented by *pro bono* counsel after Defendants filed their first motion to dismiss, Dkt. 67. The Court is persuaded that any further amendment to Plaintiff's § 1983 claims would be futile, so those claims are dismissed with prejudice. *See Offor v. Mercy Med. Ctr.*, 676 F. App'x 51, 54 (2d Cir. 2017) (summary order).

## III. State-Law Claims

"[W]hen the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) (footnote omitted). Plaintiff's claims under federal law have all been dismissed. Thus, his remaining state law claims are dismissed without prejudice.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is granted with prejudice as to Plaintiff's claims under § 1983 and without prejudice to his claims under the ADA and Rehabilitation Act. The Court further declines jurisdiction over, and dismisses without prejudice, Plaintiff's state-law claims. Plaintiff may file a third amended complaint reasserting his claims under the ADA and Rehabilitation Act. He may also reassert his state-law claims to the extent he has a good-faith basis for arguing that the Court still has subject matter jurisdiction over them. Plaintiff's third amended complaint, and a redlined copy comparing the third amended complaint to the second amended complaint, shall be filed no later than April 30, 2018.

The Clerk of Court is respectfully directed to terminate the motion pending at Dkt. 77.

SO ORDERED.

Dated:       March 31, 2018
             New York, New York

Ronnie Abrams
United States District Judge

21